[No. 1091.]

A. F. GAZLEY v. THE STATE.

1. RAPE — EVIDENCE.— As to the question whether or not a conviction for rape can be had on the uncorroborated testimony of the injured female, the rule laid down by Lord Hale obtains in this State, viz.: The party ravished may give evidence upon oath, and is in law a competent witness, but the credibility of her evidence, and how far she is to be believed, must be left to the jury, and is more or less credible according to the circumstances of fact that may concur in that testimony.

2. SAME.— Though there may be a conviction for rape, upon the uncorroborated testimony of the injured female, notwithstanding she be a child under the age of ten years, it is in that respect a case requiring special scrutiny by the jury, and a careful weighing of the evidence, with all remote and near circumstances and probabilities. In all such cases extraordinary effort should be made to secure circumstantial evidence tending to confirm the main witness. See the opinion *in extenso* on the question.

3. SAME — NEW TRIAL.— While the trial court cannot, in a criminal case, express any opinion as to the weight of the evidence, nor sum up the testimony on a trial before the jury, as they are the exclusive judges of the facts, yet, on a motion for a new trial, it is the duty of the court to set the verdict aside when it is contrary to the law and the evidence. See the opinion for the facts of a case cited in illustration.

4. SAME — PRESUMPTION OF INNOCENCE — REASONABLE DOUBT.— In arriving at the conclusion whether or not a conviction in a criminal case is sustained by the evidence, it must be borne in mind that the defendant must be presumed innocent of the crime until his guilt is satisfactorily established, and that he is entitled to acquittal if, from the evidence, there be a reasonable doubt of his guilt.

5. Same — Corroborating Testimony — Fact Case.— A correct rule has been stated by Mr. Wharton as follows: "It is true that convictions for rape have been sustained when resting exclusively on the testimony of a young child, or of a woman who, at the time of the alleged act, was under the influence of ether; but these are dangerous precedents; and when corroborative testimony can be procured, its non-production should tell seriously against the prosecution." See the opinion *in extenso* for a summary of evidence in a rape case, *held* insufficient to sustain a conviction, because the testimony of the alleged injured female, upon which alone the conviction rests, is not only uncorroborated, but is directly contradicted by the great preponderance of the testimony in the case.

6. Same — Practice — Privilege of Counsel.— Note in the opinion the suggestion of this court as to proper practice in the trial of criminal causes, especially of high degree; and also its disapproval of the line of argument pursued by counsel for the State.

Appeal from the District Court of McLennan. Tried below before the Hon. B. W. Rimes.

The appellant in this case was convicted of the rape of Minnie Daura, a female under the age of ten years, in McLennan county, Texas, on the 19th day of May, 1884. His punishment was assessed at confinement in the State penitentiary for the term of his natural life.

Dr. Joe Willis was the first witness introduced by the State. He testified that in response to a call made upon him by Mrs. Ella Trippis, to see a little Italian girl, some nine or ten years old, he reached Mrs. Trippis's house about 3 o'clock on the evening of Friday, May 30, 1884. He made no examination of the child that evening, but called next morning, in company with Dr. Calfee, and made a thorough examination of the private parts of the child, Minnie Daura by name. He found the child's privates in a highly inflamed condition, and very sensitive to the touch. He put the child completely under the influence of chloroform, and inserted his index finger into the vagina and through the hymen, and found that the hymen was ruptured and completely destroyed. He also discovered a slight bruise on the side of the vagina, and the withdrawal of his finger was followed by a flow of matter, which the witness pronounced the result of gonorrhea. In order to satisfy himself with regard to the character of the disease, the witness "packed" the vagina, and found that the pus flowed from the urethra, which is never the case in leucorrhœa. The matter or pus which flowed from the parts was sufficient to produce the soreness spoken of. Mrs. Trippis gave the witness a full history of the case, as she said she had received it from the child, and from this

account and his examination, the witness pronounced the disease a case of gonorrhea, superinduced by connection with a man. Witness discovered no other laceration of the parts, except the rupture of the hymen. Witness told the family that the child had the gonorrhea, and that some man had communicated it to her.

Cross-examined, the witness stated that he was by no means certain that the child had gonorrhea, and that it was possible she was afflicted with vaginitis or leucorrhœa. The witness concluded that the disease was gonorrhea from the fact that Mrs. Trippis told her that the child claimed to have been raped by a man. He could not swear that she had ever been punctured by a male organ, though such was his opinion derived from his examination of her person, and the history of the case as he received it from Mrs. Trippis. It was possible that the inflammation of the vagina and of the labia was the result of the flow of leucorrhœa matter. Witness has been treating the girl for gonorrhea, but would have used the same treatment for leucorrhœa. The discharge in the two diseases is nearly similar, and the local symptoms are so nearly alike as to render it impossible for a physician to give a positive opinion.

Minnie Daura was the next witness for the State. She testified that, on or about May 19, 1884, her mother went over to Mr. Gazley's house and took six of the children. The witness stayed at home a short time with Vince Trippis, and when Vince left and went up town, she locked the door, put out the lamp, got out of the window, and went over to defendant Gazley's house, where she found her own mother, Mrs. Gazley and Mrs. Massie (step-daughter of defendant) all sitting on the gravel walk. The witness then went up town, with a nickel, to Mr. McLaughlin's store to buy some cakes, which store was on Austin street, about a quarter of one mile from Gazley's house. When she came back, her little sister, eight years old, and Mr. Gazley's little daughter and others, were playing hide and seek in the yard. The witness and her sister went back of the house, and while there the defendant came to them, and took hold of her, the witness, and carried her away from her sister into his stable, where it was dark; sat down, unbuttoned and took off her drawers, took something out of his pants, and placed her on his lap with her back to his face, and put something against her. He sat perfectly still and did not move at all, and the witness did likewise. When asked by counsel for the State where he put the thing against her, she said " here," placing her hands about her pelvis. In answer to a leading question put by State's counsel, the witness said that the thing defendant took out of his pants he pushed into her, and

that is the time it hurt her, but she did not cry out or make any noise; but she did cry, and he told her to hush, and she hushed. The defendant then took her off his lap, and put on her drawers again, and she went and played with the children until they all went home. She never told her mother anything about it at any time. Witness, at the time of this trial, was between nine and ten years old.

On cross-examination, the witness said that she was about four feet from the kitchen door and about fifteen or twenty feet from the stable when defendant took hold of her. She did not cry out, or make any noise. Her sister was standing by her at the time defendant took her into the stable. · In reply to direct questions by counsel for defendant, the witness denied the following facts: 1. That about eleven or twelve days after the alleged rape, when her mother discovered the flow of matter, she told her mother, on being questioned, that no one had had anything to do with her. 2. That her mother had at the same time asked her if she had hurt herself, to which she had answered that she had not. 3. That her mother had then told her that she would get a butcher knife and cut the witness's throat or kill her if she did not tell who did it. 4. That the witness then and there said to her mother that no person had touched her, and that she had not hurt herself, and what was the matter with her had just come without the witness knowing why. 5. That her mother then said to witness that witness's father knew nothing about this, and if witness did not tell who did it, she, her mother, would tell witness's father when he came to dinner, and that her father would cut off witness's head and throw her in the well, and no one would ever know it, and witness would go straight to hell.

Denying all this, the witness testified that she had never had any talk with her mother about anything of the kind. She also denied that a day or two before the arrest of Gazley she was at her aunt Ella Trippis's house and that Mrs. Trippis took hold of her hand and felt her pulse and said to her that Dr. Willis said witness would die, and called her sister into the room to look and see how pale witness was, and that Mrs. Trippis said witness would die in two minutes; and then called for a Bible and placed witness's hands on it and told witness to speak the truth as to who did it, and then for the first time witness said it was Gazley. Witness said that this did not occur. She also testified that she did not go to school the day after the occurrence, because she had pains in her pelvic region, but went to school regularly after that and up to the time of the

discovery of her condition by her aunt, Mrs. Ella Trippis. She also testified that she had been to the DeFrancis Garden at night in company with her sister, and had come down on the Public Square once or twice alone, but denied that she had ever been at Johnson's race track.

Joseph Trippis was the next witness introduced by the State. He testified that Mrs. Ella Trippis was his wife and that Minnie Daura was the child of Mary Daura, who was witness's sister. Mary Daura brought Minnie to witness's house a day or two before the arrest of defendant, and told witness and wife that something was the matter with her. Witness's wife placed Minnie on the bed, examined her, and said "Send for Dr. Joe Willis," which was done. Dr. Willis came about 2 or 3 o'clock, but made no examination until the next day, when he came with Dr. Calfee, and said she had been fooled with and had gonorrhea. Witness applied the Bible test to Minnie on two different occasions, and she always said it was defendant Gazley. Witness had seen her often from May 19, the day of the alleged occurrence, up to the time the Bible test was applied, and she never said anything was the matter with her, nor did she say any one had had anything to do with her. She was a smart child, and has been going to the Catholic school. Witness knew Minnie to be only nine years old on May 4, 1884. This witness further stated that after Minnie told his wife that the defendant had treated her in the manner stated in her (Minnie's) testimony, he, the witness, took Minnie into a room, placed her hands on the Bible, and told her to tell him the truth about the matter, and she told him, as before stated, that the defendant was the man who deflowered her; and that again, in the evening, before he had the defendant arrested, he applied the Bible test in the same manner, assuring the girl that if she told a lie, God would punish her, and again Minnie denounced the defendant as her despoiler.

Charles Walls, the next witness for the State, testified that he was employed at the livery stable of Mr. Joe Chambers, in Waco. He knew the defendant, and had seen him go into the stalls of that stable and remain some time. On one occasion the defendant told the witness that he had an old stricture, the result of a case of gonorrhea he had had many years before, and that it troubled him greatly. This conversation occurred about a week or ten days before the alleged rape.

Dr. Calfee was next introduced by the State, and testified substantially as did Dr. Willis.

Alfred Harper testified that he had been confined in jail under a

charge of assault to murder. The defendant was called for by some parties who wanted to see him in the guard room, one Sunday morning, after he was jailed on this charge. Before responding to this call, the defendant went to a sewer and urinated. This was the only time that witness saw the defendant urinate before answering a call to the guard room. The State rested.

Mrs. Mary Daura was the first witness for the defendant. She testified that, on the night of the alleged rape, she, with six of her children, went to the house of the defendant. Mrs. Gazley and Mrs. Massie were sitting in front of the house when the witness and her children arrived. The counsel for the defense propounded the following questions to the witness: "Did you not, at your house, on the day that the defendant was arrested, say to Mrs. Gazley that you had resorted to every means to get Minnie to say what was the matter with her? Did you not then say to Mrs. Gazley that Minnie told you that she did not know what was the matter with her; that no one had hurt her, and that she had not hurt herself, and that she did not know what superinduced her condition? Did you not tell Mrs. Gazley that you got a butcher knife, raised it over Minnie's head, and told her if she did not tell you who deflowered her, you would cut off her head, and that Minnie still said that no one had hurt her? Did you not say to Mrs. Gazley that you then told Minnie that you would tell her father when he came home to dinner, and that he would behead her and throw her into the well and no one would know anything about it; and did you not say to Mrs. Gazley that Minnie still asserted that no one had had anything to do with her, and that she had not hurt herself?" To these questions the witness replied in the affirmative, admitting that she made such statements to Mrs. Gazley, except that she did not state that she had the butcher knife in her hand, but told Minnie that she would get it and cut her throat if she did not tell. Witness that evening took Minnie to the house of her brother, Mr. Trippis, to see if his wife could help her.

Mrs. Ella Trippis was the next witness for the defense. She testified that on the evening of the eleventh day after the alleged rape, Minnie Daura came to her house, as she thought, from school. She observed immediately that Minnie walked with her legs very far apart, and asked her what was the matter with her. Minnie answered: "Nothing." Witness then put Minnie on the bed, and upon examination of her parts, discovered a flow of matter that soiled her undergarments. She then asked Minnie " who the man was." She replied, "No one." Witness then sent for Dr. Willis,

who came but made no examination until next day, when he returned with Dr. Calfee. Minnie was so violent in her opposition to the examination that the doctor had to subject her to the influence of chloroform. Dr. Willis pronounced her disease gonorrhea, and said that the parts were very much inflamed and sore. After the doctors left, the witness put her fingers on Minnie's pulse, told her the doctors said that she was going to die, called on her (witness's) sister to see how pale she was, told Minnie she was dying then and could not live longer than two minutes, and that she must tell who had done it. Minnie still would not tell. Witness then called for a Bible, placed both of the girl's hands on it, and, telling her that she was then dying, charged her to name the man. Minnie then named the defendant as the guilty party. The defendant's counsel asked the witness if she did not, on May 31, in the presence of Mrs. Massie, tell Mrs. Gazley substantially what she has here testified, with regard to the extortion of Minnie's denunciation of the defendant. She replied that she did not, though Mrs. Gazley and Mrs. Massie were at her house on that day. She did not tell Mrs. Gazley that day that she could not see Minnie; that Dr. Willis said Minnie was ruptured and ruined for life. She did not say to those ladies on that occasion that Dr. Willis said that his own and the testimony of the two children would convict the defendant. Witness was then asked if Minnie's mother was not in the room at the time, and if she did not say that she had fruitlessly tried every means she could think of to get Minnie to denounce the guilty man. Witness replied that she remembered no such conversation, but could not swear it did not transpire. Witness did not suggest to Minnie that a man, or any particular man, had done anything to her, and did not even think of the defendant in connection with the affair.

Mrs. Anna Gazley, the wife of the defendant, was his next witness. She testified that about three years prior to this trial, she, a widow then with three children, married the defendant. The defendant got home from town at his usual hour on the evening of May 19, 1884, and after supper was eaten and the usual chores performed, he and she took seats in front of their door on the gravel walk. While they were sitting there, Mrs. Daura and her six children came over. The defendant gave Mrs. Daura a chair, in which she took her seat, and he resumed his. About ten minutes later, Minnie, the alleged injured child, came and told her mother, Mrs. Daura, that she had a nickel and wanted to go up town and buy some cakes. Mrs. Daura told Minnie that she thought she saw a light in her house. Minnie said no, that she blew out the light

when Vince Trippis left, locked the door, and got out at the window. Minnie then went up town, got her cakes and returned. She then went into the house with the other children and divided the cakes. When they came out of the house witness told them to go outside of the yard to play. Witness's daughter Minnie, and four others of Mrs. Daura's children, went into the street to play. After some time witness's daughter, Mrs. Massie, came to consult witness about hiring a white servant. About 10 or 11 o'clock one of Mrs. Daura's little boys came to Mrs. Daura, and told her that he was sleepy and wanted to go to bed. Mrs. Daura then collected her children and went home. Mrs. Massie went home shortly afterwards, and witness and defendant went in and retired. From the time that Mrs. Daura came to the house, which was before Minnie came, until they went to bed, the defendant did not leave the step on which he was sitting with witness, and afterwards Mrs. Daura and Mrs. Massie. He sat there during the whole of Mrs. Daura's visit.

This witness testified that she habitually and always washed her husband's clothing, and she had never discovered the trace of a suspicion about them indicating that anything was wrong with him. She knew well that defendant had had no venereal disease of any kind during the three years she had been married to him. The interview between herself and Mrs. Daura, on the evening of the defendant's arrest, occurred as stated by Mrs. Daura on the stand in answer to the questions propounded by the defendant's counsel. The witness did have the interview with Mrs. Trippis on the 21st day of May alluded to and denied by Mrs. Trippis in her examination, and Mrs. Trippis did make to the witness the statements quoted in the questions of the defendant's counsel and denied by Mrs. Trippis. When, on that occasion, the witness asked to see Minnie, and was refused, she told Mrs. Trippis that if she thought the defendant was or could be guilty of a deed so foul as that imputed to him, she, though his wife, would lend him no aid, sympathy or comfort. Mrs. Trippis then and there refused to permit witness to see Minnie, and said that Dr. Willis pronounced the girl ruptured and ruined for life.

Cross-examined, the witness said that the night of the alleged rape was a dim moonlight night, but that the street-car lamps gave light enough to see the children jumping off and on the cars. The State introduced an almanac and showed that on the night of May 19th the moon rose about 1 o'clock.

Mrs. Lulie Massie testified, for the defense, that she went to the house of the defendant on the night of the alleged rape. Mrs.

Daura and several of the children were there. Presently Minnie came, told her mother she had a nickel and was going to town to buy cakes. She left and was gone a half or three-quarters of an hour. When she returned she passed into the house by the defendant who was sitting on the door-step, divided the cakes and went with the other children to the street to play. Witness saw them jumping on and off the street cars as they passed. Witness corroborated Mrs. Gazley in full as to what Mrs. Trippis said to Mrs. Gazley on May 31, 1884. The night of the alleged rape was either a dim moonlight, or bright starlight night. The defendant was sitting on the step when witness arrived at his house, which was before Minnie arrived, and he continued to sit there, not once leaving, until witness left, which was after Mrs. Daura and all of her children left.

Dr. R. W. Park testified, for the defense, that at the instance of the counsel for the defense, he, in company with Drs. Snead and Curtis, called at the jail, on the 1st day of June, 1884, to examine and ascertain whether or not the defendant was afflicted with gonorrhea. They examined him carefully, but found no sign of gonorrhea, and each doctor agreed that he did not have the gonorrhea. They called again on the third day of the same month for the same purpose, charging the guard to produce the defendant suddenly, and to prevent him from urinating before examination; which was done. No symptoms of gonorrhea were discovered. They found the defendant suffering from an old stricture which caused him a desire to make water frequently — an effect that is peculiar to stricture. On the same day, the witness, with the same associates, at the instance of the county attorney, made an examination of the private parts of Minnie Daura, the result of which, the witness relates as follows: "Dr. Joe Willis accompanied us. We remained on the porch and he went in to prepare the girl for examination. Drs. Curtis, Snead and I, each for himself, examined her. I found her private parts inflamed and tender, but no bruises or tearing of the parts could be discovered, and no evidence of abrasion or laceration, and none were there. A number ten soft catheter, about the size of an ordinary lead pencil, was passed into the vagina and immediately there came out a quantity of creamy looking pus. The entrance to the vagina was of the normal size for girls of her age, and the hymen was intact and entirely uninjured. There was no appearance of any violence having been done to the private parts. The child had never been penetrated to the extent of rupturing and injuring the hymen or any other part of her privates by the male organ of a man. The discharge was all that was abnormal."

Continuing his testimony, this witness stated that this discharge may have been due to a variety of causes. The witness could not distinguish one kind of pus from another, and could not, for that reason, say whether the flow was gonorrhea or leucorrhœa. It is some times due to pin-worms, to scrofula, frequent rubbing of the parts, or to gonorrhea, and it is not rare with young female children. Gonorrhea can only be determined from the history of the case. The witness inferred it was gonorrhea, but could not be positive about it, and wanted the jury to distinctly understand that he did not so swear. The labia or lips of the vulva resemble India rubber, and can be readily opened by a slight push. The sexual organ of an adult male could enter the labia without inflicting especial pain.

Dr. Curtis, for the defense, corroborated Dr. Park as to the several examinations of the two parties to this controversy and their results. In the opinion of this witness, the disease with which Minnie was afflicted was vaginitis. Witness stated, in addition, that when the defendant first came to Waco, five years before this trial, he had a case of gonorrhea, which the witness treated and cured. Since that time the defendant has had stricture. Witness has been the defendant's physician, but treated him only the one time mentioned for gonorrhea.

Dr. Snead corroborated Drs. Park and Curtis as to the results of the examinations of the private parts of the defendant and Minnie. He concurred with the two physicians named, that, if the sexual organ of an adult male was forced into the pudendum of a female child but nine years old, so as to burst the hymen, it would inevitably produce hemorrhage, and the child could not possibly resist screaming out.

New trial was asked for by the defendant, upon the following grounds:

1. Because the verdict of the jury is contrary to the evidence.

2. Because the verdict of the jury is contrary to the evidence in the following particulars: First, there was no proof or sufficient proof of penetration adduced on the trial hereof to constitute the offense of rape, the evidence preponderating against such penetration. Second, the evidence herein, considered as a whole, shows that the State failed to establish the guilt of the defendant of the rape, as charged.

3. The verdict of the jury is contrary to the law, and not supported by the evidence.

4. The court erred in refusing to give the charges asked by the defendant.

*C. B. Pearre, Herring & Kelley* and *Clark & Dyer* filed an able and exhaustive brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. I. This appeal is from a conviction of rape, founded upon the uncorroborated testimony of the injured female, a girl between the ages of nine and ten years. In some States the uncorroborated testimony of the ravished female is not considered sufficient to sustain a conviction. In Iowa it is so provided by statute. (*State* v. *McLaughlin,* 44 Iowa, 82.) In California the supreme court holds that no rape case should ever go to the jury on the sole testimony of the prosecutrix, unsustained by facts and circumstances, without the court warning them of the danger of conviction on such testimony. (*People* v. *Benson,* 6 Cal., 221; *People* v. *Hamilton,* 46 Cal., 540; *People* v. *Ardaga,* 51 Cal., 371.) But the general rule is that laid down by Lord Hale, which is as follows: "The party ravished may give evidence upon oath, and is in law a competent witness, but the credibility of her evidence, and how far she is to be believed, must be left to the jury, and is more or less credible according to the circumstances of fact that may concur in that testimony." (1 Hale P. C., 633–635; 1 East's P. C., 445; 1 Russ. on Crimes, 9th ed., 921; 3 Greenl. on Ev., § 212; Roscoe's Cr. Ev., 808; 1 Whart. Cr. L., § 565; 2 Bish. Cr. Pr., § 961 *et seq.*) This is the rule adopted in our State. (*Topolanck* v. *The State,* 40 Texas, 160; *Goss* v. *The State,* Id., 520.)

And there may be a conviction for this offense even upon the uncorroborated testimony of the injured female, although she be a child under the age of ten years. (2 Bish. Cr. Law, § 968; 1 Russ. on Crimes, 9th ed., 931.) But all the authorities agree, and especially in a case where the injured female is a young child, that this is a crime requiring special scrutiny by the jury, and a careful weighing of the evidence, with all remote and near circumstances and probabilities, in cases where the testimony of the injured female is unconfirmed by other witnesses. And it has been well said that "it should be the care of the prosecuting officer, in every case of this sort, to seek carefully for circumstantial evidence tending to confirm the main witness." (2 Bish. Cr. Proc., § 967; 4 Blacks. Com., marg. p. 214: *Davis* v. *The State,* 42 Texas, 226.)

In the case of *Topolanck* v. *The State,* 40 Texas, 160, the injured female was twenty-one years of age, and she testified positively to the commission of the offense by the defendant. She did not tell

any one about it for several weeks, because the defendant threatened that if she did he would kill her and her father, and then kill himself. Our supreme court set aside the conviction, saying: "Though she was legally competent as a witness, these circumstances diminish the credit to be given to her testimony, and leave the question of the defendant's guilt in so much doubt that the jury were not authorized to render any other verdict than that of not guilty. And though the court cannot express any opinion as to the weight of the evidence, nor sum up the testimony on the trial before the jury, as they are the exclusive judges of the facts, yet, on a motion for a new trial, it is the duty of the court to set the verdict aside when it is contrary to the law and the evidence."

II. We will now examine the evidence in this case, and determine whether or not it be legally sufficient to support the conviction. In doing this, we must bear in mind that the defendant must be presumed innocent of the crime until his guilt is satisfactorily established (Penal Code, art. 11), and that he is entitled to acquittal if from the evidence there be a reasonable doubt of his guilt. (Code Crim. Proc., art. 727.) If these rules of the law, founded not only in mercy but in justice, be not fulfilled by the evidence, then the evidence is insufficient and the conviction cannot stand. ( *Walker* v. *The State*, 14 Texas Ct. App., 609.)

Minnie Daura, the alleged injured female, was aged nine and a half years at the time of the occurrence. She testifies that defendant committed the crime in a stable, situated within a few feet of defendant's house, and also close to other houses where people lived at the time; that defendant took her from where her sister and herself were playing, and carried her into the stable, pulled off her drawers, and accomplished the rape, and that she did not cry out; but that, after the deed, she went back to playing with the children. Defendant is an adult male, and a married man. At the time of the alleged rape, Mrs. Gazley, the defendant's wife, Mrs. Daura, the mother of Minnie, together with her six other children, and Mrs. Massie, were all at the house of the defendant, sitting in front of the house, and but a short distance from the stable, which was in the rear of the house.

Is this account of the alleged rape in itself reasonable, and probably true? That a rape may have been perpetrated under these circumstances is to our minds barely possible, but by no means probable. It seems to us incredible that a man could penetrate a child not ten years old, and that child not cry out from the pain which would necessarily be produced by such violence; but, on the

contrary, immediately after such violence resume her play with the
other children, as if nothing had happened. That she should thus
act is against the laws of nature, and contrary to the common ex-
perience of life. Before we could give full credence to such a state-
ment, it would have to be well supported by corroborating evidence
of no uncertain character.

In this case, such corroborating evidence is certainly most imper-
atively called for by reason and justice, and yet it was not produced,
or even attempted to be produced, by the prosecution. It is shown
by the evidence that it was within the power of the prosecution to
produce testimony which would strongly corroborate that of Minnie
Daura, if hers was true. Her sister, eight years old, was with her
when defendant took her into the stable, and yet the prosecution
does not call this witness to testify, nor was it shown that she was
incompetent to testify, or that from any reason her testimony was
not attainable. Again, Mrs. Daura, the mother of Minnie, testified
as a witness in the case. She was at the defendant's house at the
very time that Minnie says she was raped, and defendant's wife and
Mrs. Massie both testify that defendant was sitting with them and
Mrs. Daura in front of the house during the whole time that Minnie
and her mother were at defendant's house; and yet the prosecution
did not even ask Mrs. Daura where the defendant was at the time
the rape is said to have occurred, or whether he left her presence at
any time during the time she was at his house. If the defendant
was absent from the party long enough to commit the rape, it is
reasonable to suppose that Mrs. Daura would have observed the fact,
and could have testified to it. Again: a rape upon a child of such
tender years, by an adult man, it is reasonable to suppose would
have left indications of the violence, upon her underclothing. There
would certainly have been some flow of blood had penetration taken
place, and yet there is no proof of such indications, and no attempt
even to furnish such proof.

Minnie not only made no outcry or complaint of the injury at the
time, but it was not until the lapse of eleven days thereafter that
she made the statement that the defendant had ravished her. The
circumstances leading to and connected with this statement, in our
opinion, entitle it to no credit. It was discovered by her mother
that the child was afflicted with some disease which caused a flow
of purulent matter from her vagina. Two physicians, Willis and
Calfee, examined her and pronounced the disease gonorrhea, and
gave it as their opinion that she had had sexual intercourse with a
man. She was asked by her mother about it, and persistently and

most resolutely denied, time and again, that anyone had troubled her, or that she had been hurt in any way, saying that the flow had come of itself, she did not know how. Finally, her aunt, Mrs. Trippis, told her that the doctors said she must die, and, feeling of her pulse, told her she was growing very pale in the face and would die in two minutes, and, calling for and obtaining a Bible, caused the child to put both her hands upon it, and then tell who it was had injured her. Under this inquisition she said Gazley, the defendant, was the guilty party, and then related the circumstances of the rape, as afterwards testified to by her on the trial.

Prior to this extorted confession, her mother had in vain tried every means she could think of to get her to tell who had outraged her. She had even threatened to cut off her head with a butcher knife, and then throw her in the well, telling her she would go straight to hell if she did not tell the truth about it. But she all the time, in the face of these threatenings, which must have been terrific to a child of her tender years, denied that she had been injured by any one, or in any manner. When upon the stand as a witness, she denied, on cross-examination by defendant's counsel, that her mother, or her aunt, or her uncle, had used the means we have mentioned, or any other means, to obtain from her a statement as to what or who produced her injury. In this respect her testimony was positively contradicted by her mother, her aunt and her uncle. Now, in view of the manner in which this child's accusation of the defendant was extorted from her, in view of the unreasonableness of her story, and in view of the direct and positive impeachment of her testimony, we are certainly justified in saying that her evidence, uncorroborated and contradicted as it is, is entitled to no credit whatever, and should not have been made the basis of a conviction. Her account of the rape was a confession, obtained from her under and by the influence of fear, and could not have been used as evidence against her, and should not, alone, be made the basis of the conviction of another.

That the child had the gonorrhea seems to have been relied upon by the prosecution as a strong circumstance to prove that she had been outraged by some one. If she did in fact have this disease, it would furnish almost conclusive evidence that she had contracted it by sexual or attempted sexual intercourse with a male, though instances have occurred where this disease has been otherwise communicated. (Whart. & Stille, Med. Juris., § 434.)

But, to our minds, the evidence is not satisfactory that she had this disease. Dr. Willis, a witness for the prosecution, on his direct

examination stated it as his opinion that she had gonorrhea. On his cross-examination, he said that he was not positive that she had gonorrhea; she might have had vaginitis, but he concluded that it was gonorrhea from what Mrs. Trippis told him about the child being raped. Dr. Calfee testified in substance the same as Dr. Willis. Dr. Park, who also examined the child, testified as to the discharge that it might have been due to a variety of causes; that he could not tell one kind of pus from another, and could not say positively whether the flow was caused by gonorrhea or otherwise; that such a flow is sometimes caused by pin-worms, scrofula, frequent rubbing of the parts, etc.; that it is not a rare occurrence for young female children to have such a flow. Gonorrhea can only be determined from the history of the case. He inferred it was gonorrhea, but would not be positive that it was, and cautioned the jury that in his inference he might be badly mistaken. Dr. Snead, another physician who examined the child, testified that he was unable to tell from the examination whether she had gonorrhea or vaginitis. Now, who can say from this evidence that the child had gonorrhea? These learned physicians, who examined her for the very purpose of ascertaining the nature of her injuries, and the character of the disease with which she was troubled, say that they could not determine positively what the disease was, and even Dr. Willis, who at first was so positive that it was gonorrhea, admits upon cross-examination that it might have been something else, and that he concluded it was gonorrhea because he had been told that the child had been raped. What would his conclusion have been if there had been no suspicion of rape in the case? What would his conclusion have been if Mrs. Trippis had told him that the child was troubled with pin-worms, or that she was scrofulous, instead of telling him that she had been raped?

Such expert testimony as this is certainly of but little value, and should never be relied upon to convict the humblest citizen of crime. We are told by learned experts,— recognized authorities in medical jurisprudence,— that leucorrhœa, or, more properly speaking, vaginitis, is a disease which arises *spontaneously* in young children, especially of the poorer class, and is due to bad diet, uncleanliness, scrofulous taint, and epidemic influences. It may be easily mistaken for gonorrhea, the discharge in the two diseases being nearly similar, and the local symptoms so much alike as to render a positive opinion hazardous. (Whart. & Stille's Med. Juris., § 435.) Vaginitis is not an uncommon affection in girls under ten years of age, and has frequently given rise to prosecutions against innocent

persons, for the crime of rape. (Id., § 436.) An instance, very similar in many respects to the case before us, is related in the section last cited. In that case, the child most probably had vaginitis in a virulent form, and her mother and sister, upon discovering it, accused her of impropriety, and extorted from her the confession that a certain man had had sexual intercourse with her. Thereupon a prosecution for rape was instituted against the person named by her, and she testified against him. It was proved that he was in no way diseased. Under the instructions of the court, upon this state of facts, the jury acquitted the defendant.

We think from the evidence in this case, and from what we are informed by medical authors of acknowledged ability and great practical experience, it is as reasonable, and far more charitable and humane, to conclude that this unfortunate child was the victim of spontaneous disease, rather than the victim of a most beastly crime, or the willing participant with Vince Trippis, or any one else, in an immoral act. We mention Vince Trippis in this connection because Minnie had just left him when she went to defendant's house, and she had a nickel which she immediately took down town and invested in cakes. Who Vince Trippis is, or whether he gave Minnie the nickel, or what he was doing alone with her in Minnie's mother's house, is not disclosed by the record. If Minnie in fact had the gonorrhea, and caught it from any one, it was not the defendant from whom she caught it, or, if it was, then all the learned medical experts who carefully, on two occasions, examined the defendant, must be mistaken, for they all say that he was entirely free from such disease. No such examination, however, was made of Vince Trippis, nor do we mean to say that it was either necessary or proper to do so; what we mean by alluding to Vince Trippis is that the evidence in this case places him in a more favorable position to communicate the disease to Minnie than it does the defendant, and that, leaving out of view her own extorted confession, the circumstances against Vince Trippis, connecting him with her disease, are more suspicious than those brought to bear against the defendant.

There is another portion of the expert testimony in this case which we will not pass without notice. Dr. Willis testified that the hymen of the child was ruptured. He was positive about this. Three other eminent physicians, of many years' experience in the practice of their profession, after a careful examination of the child, testified most positively that the hymen was intact, and had not in any manner or to any extent been ruptured or injured, and had never been penetrated by the male organ. These three physi-

cians are sustained by both reason and authority. "A full and complete connection between an adult male and a child under twelve years of age is, on the first attempt, manifestly impossible;" and it is not probable that a single act of coition in such a case would destroy or even reach the hymen. (Whart. & Stille's Med. Juris., §§ 429, 430, 432.) It may also be here mentioned that all of the physicians who examined the child said that she bore no marks of violence upon her person; there was no laceration, or contusion, or abrasion of the parts, no irritation or inflammation except that caused by the flow from the vagina, which was the only abnormal symptom discovered.

After a careful consideration of all the evidence, we are clearly of the opinion that the verdict of the jury is not only unsupported by the evidence, but is contrary to the weight of it. The presumption of the law, that the defendant is innocent of the crime, is not overcome by such questionable, uncertain and unreasonable testimony as this case presents. Mr. Wharton says: "It is true that convictions have been sustained when resting exclusively on the testimony of a young child, or of a woman who, at the time of the alleged act, was under the influence of ether; but these are dangerous precedents; and when corroborative testimony can be procured, its non-production should tell seriously against the prosecution." (1 Whart. Cr. Law, § 565.) It would, indeed, in our opinion, be a most dangerous precedent to allow the conviction in this case to stand, even though the defendant might in fact be guilty. But when we consider that, in all probability, the defendant is entirely innocent of this most heinous offense, it would not only be a dangerous precedent, but a monstrous and inexcusable act of injustice and inhumanity, to sanction the verdict.

III. Without discussing the exceptions taken by defendant to the conduct and argument of counsel for the prosecution, we will say that in a case like this, the very mention of which arouses public indignation and fires the minds and passions of a community with a desire for vengeance against the guilty party, the court and the counsel engaged in the trial should be scrupulously cautious to accord to the defendant a fair and impartial trial, as free as possible from excitement or prejudice. There should be no clap-trap or sharp practice made use of by counsel for the State. No improper means should be resorted to, to prejudice the minds of the jury against the defendant in the remotest degree. No testimony should be offered on the part of the prosecution that is not relevant and legal. No remarks should be made by the counsel for the State

---

---

which are not fully warranted by the evidence.    Matters not in evidence should not even be alluded to in argument, where such matters might possibly prejudice the defendant.    In this case, we regret to say, that distinguished counsel assisting in the prosecution, in our opinion, suffered their zeal and indignation, and horror of the supposed fiendish crime of the defendant, to lead them into the errors complained of by the defendant, and which errors, we think, were calculated to injure his rights.    In a case like this, in which there is always excitement and feeling in the minds of the community where it occurs, and where the trial of the accused party takes place, as in this case it did, soon after the supposed crime, it requires but a trivial matter indeed to prejudice the case of the accused. This fact is well known to all who have had experience in criminal trials.

Because of the views we entertain of the questions we have discussed, the judgment of conviction is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

[Opinion delivered December 6, 1884.]